ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION
16 JUL 21 PM 3:20
SOUTHERN DISTRICT OF INDIANA
LAURA A. BRIGGS
CLERK

| | |
|---|---|
| **MARK JOHNSON,** **Plaintiff,** | **Civ. No.______** |
| **v.** | **JURY TRIAL DEMANDED** |
| **JASON INDUSTRIES, INC. dba OSBORN,** **Defendant.** | **JULY 20, 2016** |

1:16-cv-1935 RLY -MPB

## COMPLAINT

Plaintiff Mark Johnson (hereinafter "Plaintiff") by and through his attorney Mark P. Carey, of Mark P. Carey, P.C., files this Complaint against the Defendant Jason Industries, Inc. dba Osborn, (hereinafter "Defendant"). Plaintiff alleges as follows:

## I. PRELIMINARY STATEMENT

1. This is Plaintiff's Complaint for age discrimination pursuant to the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621, et. seq., asserting that Defendant discriminated against him because of his age. Plaintiff also brings a pendent cause of action for age discrimination under Indiana's Age Discrimination Act (IADA), Ind. Code, §22-9-2-2 asserting that Defendant discriminated against him because of his age. Plaintiff also seeks liquidated damages under the ADEA, attorneys' fees and costs, and such other equitable relief the Court shall award.

## II. JURISDICTION, VENUE & PARTIES

2. Plaintiff is, at all relevant times, a citizen and resident of St. Louis, Missouri. Plaintiff is currently 61 years old.

3. Plaintiff at all relevant times, was employed with Defendant at its 2350 Salisbury Road N, Richmond, IN 47374 location.

4. Defendant is a corporation doing business within the Southern District of Indiana.

5. Defendant Jason Industries Inc. is a publically traded company with its headquarters located in Milwaukee, Wisconsin.

6. Defendant is an industrial manufacturing company that prior to January 19, 2016 consisted of 4 business groups or divisions: Seating (Milsco), Automotive Acoustics (Janesville Acoustics), Finishing (Osborn and Sealeze), and Components (Jason Components, Morton and Metalex). Osborn and Sealeze make up Jason's Finishing Group.

7. Osborn is a Jason Industries, Inc business unit. It is part of the Jason Finishing Group business group. Jason Industries, Inc. is Osborn's parent company. Osborn's headquarters are located in Burgwald, Germany with a U.S. headquarters office located at 2350 Salisbury Road N, in Richmond, IN 47374. Osborn is the world's largest solution provider of high-quality surface treatment and finishing tools for hundreds of commercial and consumer applications, such as metal finishing, honing and surface polishing.

8. During Plaintiff's employment, Jason Finishing Group consisted of two companies, Osborn and Sealeze. Jason Industries, Inc. is the parent company to both Osborn and Sealeze. Sealeze has its U.S. headquarters at 8000 Whitepine Road, Richmond, VA 23237. Sealeze is the foremost innovator in brush solutions for a broad range of industrial applications.

9. This action is authorized and instituted pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621, et.seq., and pursuant to 28 U.S.C. Sec. 451, 1331 and

1343(3) and (4). This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

10. All of the allegations made herein occurred within the territorial jurisdiction of the United States District Court for the Southern District of Indiana.

11. Venue is proper in this Court.

## III. PROCEDURAL PREREQUISITES

12. On February 25, 2016, Plaintiff, filed a "dual charge" of discrimination against Defendant with the Indianapolis, Indiana Office of the Equal Employment Opportunity Commission (EEOC) and the Indiana Civil Rights Commission (FEPA). A copy of the dual charge was sent to the Defendant on the same date.

13. On March 17, 2016, Plaintiff received a letter from the EEOC stating that the Charge with the Indiana Civil Rights Commission (FEPA), 24F-2016-0036 was administratively dismissed because the charge was a duplicate of the EEOC first filed Charge No. 470-2016-01181.

14. On July 12, 2016, Plaintiff received its Notice of Right to Sue from the EEOC for Charge No. 470-2016-01181. Attached as Exhibit A.

15. All administrative prerequisites to the institution of this action have been satisfied.

## IV. STATEMENT OF FACTS

### PLAINTIFF'S EXCEPTIONAL WORK PERFORMANCE

16. Plaintiff was employed with Defendant as Osborn's Vice President, Sales and Marketing North America for nearly 7 years before he was unlawfully terminated on January 19, 2016 because of his age. Plaintiff was treated differently than similarly situated younger employees. Plaintiff was discriminated against because of his age.

17. Plaintiff was highly successful in his role. Plaintiff never received a negative performance review and in fact earned bonuses every year beginning in 2010 totaling in excess of $220,000 over the course of five years. Plaintiff was well regarded by his peers, his staff and by Osborn customers.

18. Plaintiff started in his current position with Osborn on August 24, 2009. Plaintiff was hired as the Vice President, Sales and Marketing North America for Osborn. On September 8, 2009, Plaintiff was presented with a non-compete agreement to sign. As he had already started the job two weeks prior, it was presented to Plaintiff as a condition of his employment, not subject to negotiation. Plaintiff was not afforded the opportunity to have a lawyer review the document. Plaintiff could take it or leave it. Plaintiff felt he had no choice but to sign the document.

19. The non-compete was signed by the HR Admin, Barbara Suponcic, and not the HR manager, Jeff Power. The terms were not negotiated or discussed. The HR manager would typically have signed all employment -related and important documents for Osborn.

20. In January 2011, the US President who hired Plaintiff and to whom Plaintiff reported, Richard Halen, was eliminated in a Jason Finishing Group/Osborn reorganization. The decision was made to have one Global President, not one in North America and another in Europe. This reorg reflected an effort to have the Defendant's business function more effectively as a truly global organization. What evolved over the next several years, and continued up until Plaintiff's termination on January 19, 2016 was the development of Osborn as a "matrix organization". In that organization there was no longer a US President or even General Manager. The management of the North American market

essentially was a self-managed team consisting of a head of Sales and Marketing (Plaintiff) a head of Operations, and a head of Finance. The team in turn reported to the Defendant's global counterparts. Plaintiff reported directly to the Global VP of Sales in Germany, Mr. Chris Dilger and the President, Finishing Segment, Mr. Florestan von Boxberg.

21. Plaintiff never reported to Brian French, HR. Plaintiff never had a face to face meeting with Mr. French. Plaintiff's only interaction with Mr. French were a few phone calls over the 7 years Plaintiff was employed at Osborn.

22. The Osborn business Plaintiff was responsible for in North America (US, Canada and Mexico) was made up of five very different businesses each with its own structure and go to market strategy. When he was hired these businesses were all run separately. In that sense his role was a new one where he was the first sales VP responsible for all five.

23. Florestan von Boxberg, President, and his senior leadership team designed Defendant's complex global business as a Matrix organization soon after they took charge of the global organization over the publically voiced objections of former CEO Dave Westgate and former CFO Steve Cripe. Westgate and Cripe's concerns were pretty basic. They stated they had never seen a matrix organization succeed. Plaintiff also had concerns about this matrix as it was being developed. But after communicating his concerns to Mr. von Boxberg, he accepted the decisions of his superiors and moved on to execute to the best of his abilities. On information and belief, Mr. von Boxberg, supported the concept of a Matrix structure, as did Plaintiff.

24. Plaintiff, Mr. von Boxberg and Mr. Dilger, along with the entire senior leadership in the US and Germany including Luis Hereza, Global Marketing, John Lukow, Global

Finance, Albrecht Teich, Global Operations, Doug Pollack, President of Sealeze, Tom MacLean, NA Operations, Mark Cunningham, HR, were a team and functioned effectively in a very challenging global economic environment. They worked together as a team and found resolution when faced with challenges.

25. In the first 18 months of this reorganization, from 2012 through late 2014, it became obvious that the Manufacturer's Reps were not getting the job done and Defendant needed to make another change. The team (Plaintiff, the CEO and members of the board) went with the Reps in 2012 as it was, in Plaintiff's mind, the only way to get the "feet on the street" without adding headcount. It took about nine months to convince management in Germany and all the way up to the CEO that the move Plaintiff wanted to make in 2012, going to Reps, was a smart move. In Plaintiff's mind and in the eyes of many, including team members and Defendant's customers, what his team did in 2012 was a bold move. However, after this transition, Plaintiff strategized that the only way to get the Distribution business, the largest of the five business units reporting to him, back on a growth path was to eliminate the Reps and go back to a factory direct sales force. That meant adding headcount and boosting SG&A. The other business units were doing well, but Distribution, the largest, was stalled.

26. In the fall of 2014, it was clear that Plaintiff made another bold change and moved away from the reps to a structure pre 2012. It was clear to Plaintiff that despite all his team's efforts something need to change, again. So strategically, Plaintiff identified the problem, and created a plan to resolve it and over 4 months worked with a team to solve the problem.

27. The marketplace, meaning the loyal Distributors, made it really clear what Osborn/Jason needed to do – they needed to go back to a factory direct sales force. In the four surveys Plaintiff's team ran over that two-year period the number one complaint was lack of support from the Reps. When Plaintiff announced that decision at a national meeting of their largest customer Buying Group, Affiliated Distributors on March 17, 2015 in Dallas, Plaintiff was greeted with a round of applause. Plaintiff explained to almost 500 people why we did what we did, and why we felt we needed to reverse that decision. Never in 40 years has Plaintiff been more praised and complimented by so many people for what was described to him as being decisive, smart, honest, brave and full of courage. Even today, two years later, Plaintiff still get compliments on that action. This was not a failure. It was the right choice for the company.

28. So in Q4 2014 Plaintiff's job got more complicated. Not only was he restructuring away from the Reps, but there was always pressure from Milwaukee (headquarters) for Osborn to shrink its footprint, to close locations, to be more centralized. In the fall of 2014 that pressure came in the form of pressure for Osborn to close the Cleveland office, the North American HQ, and relocate all those jobs to our plant location in Richmond, IN. Management all knew this had to happen eventually. Plaintiff argued hard for two days that Osborn not to move headquarters at the same time as the restructure because the level of disruption with moving a sales team would be very difficult to manage due to potential high turn-over. Plaintiff lost the argument and the restructure and headquarters relocation happened simultaneously.

29. On or about, October 2014, Defendant announced the plan to move from Cleveland to Richmond. With that came a revision and formalization to the severance plan that was to

be offered to employees who were either not offered the opportunity to move or who did not want to move. Defendant offered the opportunity to move to a select group of people, a moving allowance that varied depending on whether the individual owned a home or rented in Cleveland. For those who were not asked to move or who opted not to make the move they got the new severance package which was one week per year of service to a max of 26 weeks. Only one person accepted the offer to move. No one from Customer Service, or Marketing, both of which reported to Plaintiff, or Finance, accepted the move. Only one employee from Operations agreed to move. The rest took the package (unless they opted not to stay to the end in which case they forfeited their package).

30. As a result of the move from Cleveland to Richmond, and the sales force Reorg, several of Plaintiff's managers quit. Osborn had a huge challenge on its hands. Plaintiff had to replace his entire Marketing team (3), all of the Cleveland Customer Service including the Manager (12), fill six new Distribution territories and fill four other roles that opened up. (When all was said and done in September of 2015 Plaintiff had 7 of 10 direct reports new in a year, all new Customer Service and all new Marketing. In total 34 of the 47 people in Plaintiff's group were new in the last year.

31. One of Plaintiff's challenges in doing all this hiring was that Plaintiff was reminded routinely of his need to hire with an eye toward "uptalenting" and succession planning. It was made very clear to Plaintiff by everyone from Brian French, Jason's VP of HR, to Florestan, to Chris Dilger and Marc Cunningham, that he needed to "uptalent," to hire a stronger more capable team. "Uptalent" also assumed the new hires would be young, 30 year-olds, or maybe early 40s, and capable of doing the current job as well as the next

and the next. Plaintiff understood that new employees must be young so they could grow with the company. Plaintiff was under extreme pressure to boost this succession plan.

32. Plaintiff was the "face of Osborn," meaning that he was a visible and acknowledged leader in North America. Customers and customer groups knew him. German leadership was not known in the field, and Jason was only a name on a page – zero visibility to the marketplace. With all the turnover, it was more important than ever to maintain some point of continuity. With Plaintiff gone there is none. On information and belief, that was the main reason Mr. von Boxberg and Mr. Dilger made sure that Plaintiff remained employed during the move and restructure.

33. Plaintiff's numbers have always been exceptional. In 2012, his team achieved 96.96% of its sales goal. In 2013, his team achieved 98.09% of its sale goal. In 2014, numbers continued to increase with his team's sales at 100.59%. In 2015, his team remained steady and achieved 97.29% of its sales goal, despite a reorganization and moving headquarters. These numbers are remarkable compared to industry comparisons and different teams among Osborn. On information and belief, other sales teams at Osborn, did not produced the same highly successful numbers as Plaintiff's team. Not to mention that the entire industry suffered losses in 2015 and the business decisions that Plaintiff made were also the decisions of his superiors, not his alone.

34. Plaintiff's numbers improving EBITDA were impressive. Up to and including 2015 their Jason wide goals in the Management Incentive Compensation (MIC) were focused on improving bottom line – EBITDA was the primary measurement and what we were paid on plus a smaller percentage based on working capital. While Plaintiff's team always had an annual revenue plan, and its ability to hit its EBITDA goals were related to

revenue, Plaintiff was rewarded based on being able to improve EBITDA year over year. When Plaintiff arrived our EBITDA was about 4% in North America, barely positive. Despite decades of hovering at or below the same 10% as many industrial suppliers deliver, under Mr. von Boxberg's leadership we set a global goal in 2012 to hit 18% within five years. In 2014 Plaintiff's North American business actually hit 18% in three of the twelve months. This was the first time a team was able to hit that target anywhere in Osborn and Plaintiff's team finished the year around 15%. Plaintiff's team achieved record profitability. In North America in particular Plaintiff was able to grow sales, admittedly modestly, in a negative industrial growth environment, while delivering best ever EBITDA, increased margins, maintained an SG&A significantly lower than the rest of the world.

35. In early 2016, just before Plaintiff was terminated, Plaintiff and his team were on a roll and making its numbers. They hit plan in November and December 2015 for the first time all year and their numbers in January 2016 were impressive and very near plan. Plaintiff's team was responding to Plaintiff and his leadership.

36. Plaintiff has worked in this industry for 30 years and has always been praised for being a quality leader. In the 7 years he worked for Defendant, only two employees, Todd and Robin, had an issue with his leadership style.

37. On or about June/July 2015, Mark Cunningham, HR, informed Plaintiff of the comments directed toward him in the exit interviews with Todd Reasonover and Robin Lang. Plaintiff was very disappointed with what he heard about their comments, especially since Plaintiff has been in a Sales Leadership position since 1984 in different companies and have NEVER been rated poorly by any of his direct reports or members of his staff.

Quite the contrary Plaintiff has been told many times that he was the best or among the best managers many of his people ever reported to.

38. The reason for Reasonover and Lang's comments require some background on both. Todd and Robin were both long term Osborn employees from the "original Osborn." They were decidedly unhappy with the direction Defendant was going as a company on many levels. They did not like the merger and direction from Germany or from Milwaukee, they did not like the changes Plaintiff was making and had made. Both began their careers when Osborn was the dominant player and they saw the long decline we suffered through. As the last remaining members of the original Osborn in the Sales department these two were close personally. They had a tendency to be negative and had the ability to work each other up over things out of their control. Both came close to losing their jobs at different times, for different reasons, when Plaintiff found their work performance diminished. Plaintiff worked with both to improve what he told them were areas of improvement. Robin in particular responded well and became a solid performer in her limited role managing Private Label. Todd was a different story. He did not show the strength, leadership, creativity or strategic acumen necessary to improve.

39. On information and belief, Osborn discriminated against Robin and Todd based on race and gender. Todd was our only minority sales person at Osborn and Robin the only woman when Plaintiff joined in 2008. They were both badly underpaid when Plaintiff came on board. Over several years Plaintiff made deliberate and specific efforts to move them up as effectively as possible under the compensation rules Defendant had in place. By the time they left they were at satisfactory compensation levels. On information and belief, Robin and Todd thought Plaintiff was the reason they weren't getting higher pay.

Plaintiff expressed to upper management, on many occasions, his concerns that Robin and Todd, were not paid well enough to keep them from being poached if and when they chose to leave.

40. Robin left first, hired away by her biggest customer at a salary level 30 to 40% more than what we were paying her. She and Todd were very close as work associates. When she heard there was an opening at her new company in sales management she connected her new employer with Todd. He too saw a significant salary increase in the 30% range. Both Robin and Todd left Osborn for higher salaries. Both Robin and Todd told Plaintiff that Osborn's decision to move headquarters to Richmond was a deciding factor in their reason to seek new employment. Even though it was made clear to them that they need not relocate, they said they saw that as only temporary and neither wanted to work from home.

41. On information and belief, Robin and Todd coordinated what they would say and how they would say it in their exit interviews with Mr. Cunningham. Mr. Cunningham told Plaintiff he conducted the exit interviews, about 30 days apart, and that Robin and Todd used almost the same words in describing the circumstances related to their departure. While these two ex-employees' comments were, in part, negative about Plaintiff's managerial style, they do not negate the years of incredibly positive feedback he has received from his direct reports at Osborn that he is a strong and capable sales leader. Plaintiff has been managing employees for 30 years and in those 30 years, only these two employees did not care for his management style. The exit interviews with Robin and Todd were also critical of Germany, Milwaukee and actions taken by the company as a whole. The exit interviews were not just in reference to Plaintiff.

42. In June/July 2015, after Mr. Cunningham provided Plaintiff with a copy of Todd and Robin's exit reviews. After reading them, Plaintiff requested to submit a rebuttal statement. Plaintiff believed their reviews to be an unfair critique of his performance. Plaintiff called Mr. Dilger and asked him how he could submit a formal rebuttal. Mr. Dilger said that the exit reviews were taken with a grain of salt and that he and Mr. von Boxberg knew Plaintiff was a solid performer. He told Plaintiff not to worry about the reviews and was very specific that Plaintiff should not submit a rebuttal.

43. On information and belief, in July 2015, Mr. von Boxberg, Mr. Dilger and Mr. French were at this point trying to find a way and reason to get rid of Plaintiff. Plaintiff had no negative performance reviews of his own. So, on information and belief, Mr. Dilger instructed him not to submit a rebuttal to the exit reviews so there would be no record of Plaintiff's objections and Osborn would have a least something to inflate and call "negative" about Plaintiff's leadership abilities. This was an adverse employment action. On information and belief, Mr. Dilger did not instruct younger employees to refrain from submitting rebuttal statements.

## UNLAWFUL AGE DISCRIMINATION

44. As the matrix continued to evolve there was constant pressure to reduce costs. A big part of that always revolved around headcount throughout the organization, reducing footprint and cutting SG&A (selling, general and administrative). Plaintiff always resisted that pressure because in the US we ran a very lean operation already – Plaintiff's SG&A tended to run about 18% and his cost of sales (manpower) ran about 10% and he worked hard to keep that in line. From the very beginning, from late 2009 until present, there were comments made in senior staff and strategy meetings that Defendant, in the US, had

too many employees who were too old. In meetings going back to 2011 that included the Osborn senior leadership (Florestan von Boxberg, Albrecht Teich, Luis Hereza, Jeff Schad, Thom MacLean and Jeff Power) and Jason executives (Dave Westgate, CEO and Steve Cripe, CFO) there were comments and criticism of the organization due to the aging workforce. As the leader of Sales and Marketing, Plaintiff was frequently reminded that he did not have a sustainable organization, that he had no real succession plan for his teams, especially in Polishing. It was made clear to Plaintiff that it was his job to ensure Osborn had the right people in the right jobs to take them to the future. The implication was always that Plaintiff needed to hire younger blood and to try to encourage the older employees to retire.

45. Florestan von Boxberg and Chris Dilger, Global VP Sales, in particular, made frequent references to needing to replace the older workers. Plaintiff had a number of older employees on his team. These comments would be part of quarterly reviews and annual strategy sessions going back to 2011 up until January 2016. The euphemism that was used was employees with "short runways" meaning not long to work before they would eventually retire. The conversations were often wrapped around the need for succession planning as it was seen that Plaintiff's team did not have a sustainable organization, that it had an aging workforce and needed to do something about that.

46. For the duration of Plaintiff's employment and especially in the last few years, the conversations about getting rid of older employees were frequent and involved the entire management team, (Florestan von Boxberg, Albrecht Teich, Luis Hereza, Jeff Schad, Thom MacLean and Jeff Power) and Jason executives (Dave Westgate, CEO and Steve Cripe, CFO). It was usually brought up by someone on the US side, like Jeff Power in

HR or more recently, Marc Cunningham in HR, that "we can't say that," "we can't have those conversations," (HR managers, Jeff Power then Marc Cunningham would always point out that this was not something Plaintiff's team should discuss) and the response was generally along the lines of, "of course we can't say that, but what are you doing about it?" Plaintiff was under constant pressure to replace the older workers with younger workers. Plaintiff tried to be practical in his response to these comments and the pressure on him by rationalizing with the management team that – if these older guys left, or were encouraged to leave, or were pushed out, Plaintiff had no one positioned to replace them. Plaintiff needed to be able to hire "now" to develop and train the next generation. This was always acknowledged as true and Plaintiff's superiors understood his complaint that they shouldn't terminate employees because of their age.

47. Plaintiff as directed to hire young employees for the purpose of replacing older employees. On or about 2014, Plaintiff hired a younger technical person in polishing (Tim Priestley, age 40s) with the understanding that he would eventually replace Tom Carrillo, age 68.

48. On or about Q2 2011, one effort, sanctioned and orchestrated by HR (Jeff Power, HR Manager) to encourage the older employees to retire was to offer a separation package to all employees over 60. It was offered to all salaried employees who qualified based on age and tenure and the plan was wholly unsuccessful. No one took HR up on the offer as the offer was not at all attractive. It was less attractive than the offer of that was offered when Osborn moved from Cleveland to Richmond in 2015. In the 2015 offer, older employees were encouraged to retire and offered one week per year of service up to a max of twenty-six weeks. It was the singular lack of success of this offer (2011) that

caused Jason, Inc. to enhance the policy company wide to what was ultimately offered in the Cleveland to Richmond relocation. Several of the employees to whom this offer was directed were very concerned, afraid even, that they would be forced to take the package and retire before they wanted to leave. Specifically, Plaintiff had conversations with Tom Carillo (age 68), Doug Berlet (age 67), Art Varvoutis (mid 60s) and Paul Marhefka (age 66) explaining to them that it was only an offer that they were free to take or leave. The offer was not made to substantially younger employees.

49. Ongoing from 2011 to present, upper management continued to discriminate against the older employees and attempted to convince them to leave. Upper management, especially Chris Dilger and Florestan von Boxberg, continued to apply pressure on Plaintiff in every quarterly and annual business review to find ways to develop a younger team. There were four people in particular in Plaintiff's group, all well over 60, who attracted attention and were brought up every time the topic came up. Two were managers at the time, Doug Berlet, now about 67, who was Plaintiff's Director of Sales for the Polishing group and Art Varvoutis, now retired, was in his mid 60's and Director of Sales for Plaintiff's Distribution Group for the Western half of the country. The other two were Tom Carrillo, a Field Application Engineer in Polishing, and Dave Bartley Key Account Sales in Polishing, both today in their late 60's. Art and Doug in particular were the topic of many inquiries. All four received the 2011 retirement offer, all four said they were not ready to retire and declined the offer. Plaintiff was asked routinely by his managers, Chris Dilger and Florestan von Boxberg when Doug, Art, Tom and Dave were going to retire, and how long were they intended to stay. Plaintiff was directed by Florestan, on multiple occasions, going back to 2011 to follow up with Doug, Art, Tom

and Dave and find out when they planned to retire. Plaintiff was under duress from Florestan and Chris Dilger and felt he had no choice but to ask about their retirement plans. So, even knowing it was wrong to ask, and over his objection to Florestan and Mr. Dilger, Plaintiff did directly ask each of them on multiple occasions going back to 2011 and continuing to 2015 when they planned to retire. Plaintiff personally did not want them to leave, they were doing too well in their current positions and Plaintiff had no one to replace them. However, Plaintiff had such pressure from upper management to encourage them to retire that he was forced to discuss retirement with Doug, Art, Tom and Paul. Plaintiff approached the topic by telling them he needed to know what their plans were so he could make plans of his own. Art in particular got upset and testy with Plaintiff in the summer of 2011 after the third time Plaintiff asked over an 18 month period. He told Plaintiff in very clear words something along the lines of "I told you I'd let you know a good six months in advance before I pull the plug. Quit pressuring me!" Plaintiff did not want to ask these questions, he knew it was wrong to press them, but he feared that if he did not, he would be asked to come up with a plan to remove them. He also did not want to lose his job. Plaintiff quickly became very conscious that he was in fact the oldest member of the management team.

50. In 2012, when Art Varvoutis had announced his plan to retire Plaintiff designed and executed a significant reorganization of his North American Sales force. Art's retirement did not trigger the reorg plans, but his leaving did make the changes envisioned easier to accomplish. A big part of this plan was to eliminate 6 of 16 territory managers, reassign another six within Plaintiff's organization and hire on manufacturer reps agencies to replace his factory direct sales force. The main object to this reorg was to separate the

Polishing and Distributor sales forces into two groups as the go to market strategies and tactics were very different in the two groups. Mr. von Boxberg and Mr. Dilger felt Plaintiff did not have a viable succession plan for the Polishing business unit, because 5 of the 10 members (Doug Berlet, Dave Bartley, Tom Carillo, Debbie Shadley and John Bhatka) of that sales team were over 60. No matter, this team did extraordinarily well under the new organizational plan with growth of sales and margin. Still, despite their success, Plaintiff was asked three or four times a year by Mr. von Boxberg and Mr. Dilger how do we replace these "older guys." Plaintiff was never told to replace the younger employees. Defendant has a practice of discriminating against older employees.

51. Mr. von Boxberg and Mr. Dilger would refer to their discriminatory acts as "succession planning." "Succession plan" was a politically correct way to tell Plaintiff to identify which younger employees had the capabilities to take over for the old employees once the old employees left the company. In the course of their quarterly and annual strategy and planning meetings in 2010, 2011 and up to 2015 the topic of "succession planning" was a brought up virtually every time in every meeting. Plaintiff was under constant pressure to identify a succession plan. It was made very clear by both Florestan and Chris Dilger, when, during the recent hiring in 2015, hiring six new salespeople and five new sales managers, that Plaintiff needed to be sure to hire candidates who could move up in the organization. It was clear that new hire candidates were to be young.

52. In the conversations Plaintiff had with upper management (not only Mr. von Boxberg and Mr. Dilger) when we discussed "succession planning," the term meant that he was to hire younger people to replace the older team members as well as Plaintiff. Age most certainly had something to do with it. Plaintiff was to only hire younger employees that

met the profile created by Mr. French, Mr. Cunningham, Mr. von Boxberg and Mr. Dilger. The profile of any new employees Plaintiff was supposed to hire was a person who was young, promotable and capable of taking the next job and the next after that. The profile as they used it, was to look for new young recruits and not for older employees. This profile did not include experienced salespeople in their late 50's and early 60's who were capable of being effective immediately but not moving up the ladder. Upon Plaintiff's hiring a new employee, and seeking approval from upper management, the younger employees were approved right away, any suggestion of hiring employees in their 60's received much resistance and push back.

53. Discrimination against older employees was so prevalent that when, on or about 2015, Plaintiff found two older candidates he wanted to hire (Michael Cassady (Q1 2015) and Vin Boshar (summer 2015), both over 60 years old), Marc Cunningham was not happy with his decision to hire them because of their older ages. Marc said something along the lines of "these candidates don't match the profile." Which Plaintiff understood to mean that they were too old. Both had the experience to be "plug and play" in a sales territory. Because Marc Cunningham was not happy, Plaintiff was required to "justify" his hiring decision up the line before the offer would be signed off on and approved up to both Florestan von Boxberg and Chris Dilger in Germany and Brian French in Milwaukee. While all new hires had to be signed off on upstairs, this level of justification was not required when Plaintiff hired younger employees. Plaintiff had to go out of his way to convince upper management that the two older employees were the right choice. And still he could tell they were not happy with his urging them to hire these two. Mr. Cassady was terminated shortly after Plaintiff was unlawfully terminated.

54. It was in this time frame, on or about Q4 2014, that Plaintiff had conversations with Florestan and Chris, Luis Hereza, John Lukow, Albrecht Treich, Thom MacLean, and Marc Cunningham regarding when Plaintiff planned to retire. Plaintiff acknowledged his intention to retire in the next three to five years and they made it clear that Plaintiff needed to hire a younger candidate who could be his replacement. This put Plaintiff in a frustrated position because due to headcount restrictions he was unable to hire new, younger people who could be trained to replace the workers identified as having "short runways," like himself. As a result, and on information and belief, upper management's focus was to eliminate the employees with "short runways" first. Plaintiff felt like he was being given an almost impossible task, a real "Catch 22" because if he couldn't bring in people to be trained because he couldn't increase the SG&A, how could Plaintiff possibly develop a reasonable succession plan? There was no positive resolution and the result was Osborn simply encouraged older employees, including Plaintiff, out the door.

55. The comments and remarks upper management made to Plaintiff directly regarding pushing older employees out the door and replacing them with younger employees were consistent. It was not just Mr. von Boxberg and Mr. Dilger who discriminated against Plaintiff and encouraged the discrimination of older employees. Also involved were Mr. Westgate (CEO) and Mr. Cripe (CFO). There was a hostile work environment created and a tone set to get rid of the older employees and replace them with younger workers. This hostile tone was voiced in upper management meetings. It was a topic in almost every meeting at the global level and North America included those attended by Mr. Westgate and Mr. Cripe (ex CEO and CFO) and the entire senior staff of Osborn. The discrimination and hostility that came with it was so invasive that it interfered with

Plaintiff's ability to do work. Instead of focusing on his daily tasks, there was always the nagging sense that he had to encourage his team members to retire and get them on an exit plan instead of encouraging them to do good work and lead them to success.

56. During the second reorganization in 2014/15, Plaintiff was made supremely aware that succession planning was important. The pressure to find younger employees was increasing and Plaintiff was under a great deal of stress. When the subject was broached with upper management (Florestan von Boxberg, Chris Dilger, John Lukow, Thom MacLean and Marc Cunnigham, the full management team). Plaintiff openly discussed his desire to retire around age 65. Knowing that there was always pressure for older employees to retire, Plaintiff let management know that he aspired to a planned and logical departure. During 2015, the point Plaintiff made repeatedly over was that he would not leave until he was "done" and the North American business was back where he wanted it to be. On information and belief, it was generally known within the management team that Plaintiff was planning to stay employed and that he was not ready to retire.

57. In January 2015, the discriminatory behaviors of upper management and the pressure to encourage the older employees to retire continued. Plaintiff managed two Inside Sales Associates, Debbie Shadley and John Bhatka (both in their late 60s), located in Defendant's Whittier, California office. They were both highly successful in sales with no performance issues and Plaintiff valued their contributions to the team. John Lukow, CFO, was constantly urging Plaintiff and pressuring him to close the Whittier location and terminate both Debbie and John because they were older employees with "short

runways." Respondents have a practice of age discrimination and favoring younger employees over older employees.

58. In December 2015, Plaintiff's team was asked by Mr. von Boxberg, after some tough meetings he had in Milwaukee with the Executive Committee, to look hard at the business to identify what could change to produce better results. Plaintiff's team was asked to look at people, at its footprint, at its structure, to look at everything to move the needle. Plaintiff believed, as it related to Sales and Marketing, they had already made those major changes and Plaintiff expressed real concern about cutting what was essentially a new team. And, as Plaintiff pointed out, they were moving the needle with such positive results since November 2015. Plaintiff's team was exceeding their goals and making positive changes. All team members were performing well and no one had performance issues that deserved termination.

59. However in response to Mr. von Boxberg request, Plaintiff helped Mr. von Boxberg and Mr. Dilger compile A, B, and C lists of employees who could be terminated. On information and belief, an employee's age was considered in compiling these lists. Plaintiff did not learn until months after his termination that he had been put on the C list.

60. The senior management team (Plaintiff, President Florestan von Boxberg, Global OPS Albrecht Teich, Global Finance John Lukow, NA Ops Thom MacLean, and NA HR Marc Cunningham) spent several hours on January 11-13, 2016, outlining a detailed and tiered action plan describing what they thought they could do immediately, then midterm (Q2) if things were not improving and finally longer term (Q3 or Q4) if business did not show the desired results. During these days senior management (Plaintiff, Florestan von Boxberg, Albrech Teich, John Lukow, Thom MacLean and Marc Cunningham) had

lengthy discussions on how it might be possible to eliminate the same older sales people that had been discussed time and time again, specifically Tom Carrillo, Doug Berlet, Dave Bartley. Florestan again asked Plaintiff "when will they retire?" Plaintiff again pointed out that they were doing well in their jobs, that in order to replace them he needed to be able to hire new people under them to learn the business. Senior management talked about possibly offering another "early retirement" package, discussed the pros and cons and what could and could not be done legally. Specifically, it was discussed how to construct such a plan so that only the "right people" (meaning the older employees) go. Senior management determined this was not a good option but in the course of that discussion Plaintiff did throw out a scenario whereby he was willing to try to convince Doug Berlet, the 67 year old Director of Sales for Polishing to step down to a key account manager role and let one of the up and coming Business Development Managers assume the Director of Sales role. (This was very similar to what had been orchestrated in Q4 at Sealeze where Doug Mattice, VP of Sales at Sealeze stepped down to a key account role and allowed the promotion of a young manager from Milsco, Drew Stahr, who had no sales or sales management experience, to become the new VP of Sales. While Doug Mattice agreed to the plan, he had not given anyone a retirement date. The expectation from Florestan was that it had to be "soon" as there was no cost savings until he was gone. Doug was terminated on Wednesday January 20, 2016, along with his president, Doug Pollack, but his name was left off the Exhibit A since, as Plaintiff was told by Marc Cunningham, "that was a different case.")

61. During these January 11-13, 2016 meetings, senior management all sensed there was going to be some future action taken, but they did not know what or when. They did not

know what was going to be asked of them by Milwaukee. They expected there to be some directive, some specific goal, a number of people to cut, or dollars to cut, but it was very quiet from Milwaukee. In their discussions, senior management even went so far as to discuss a "doomsday scenario" where they explored how the global structure they operated under had certain redundancies because of the global nature of the business. They asked themselves if things went really bad, should they take dramatic action. For example, they discussed closing the Sealeze plant in Virginia and moving that business up to Richmond, IN, they discussed if they needed a global Finance, and global Sales and global OPS leaders. Senior management dismissed these as way too radical and too harmful to the business, but they acknowledged they needed to have had the discussion.

62. Osborn has a management practice of terminating older employees because of their age. Every single employee terminated between March 18, 2016 and March 22, 2016 were in the protected category and most were 50 years old or older. Osborn provides a list of terminated employees as part of their severance offers:

| Job Title | Age | Selected | Not Selected |
|---|---|---|---|
| Customer Service Rep | 34 | | X |
| Customer Service Rep | 25 | | X |
| Customer Service Rep | 35 | | X |
| Customer Service Rep | 60 | | X |
| Customer Service Rep | 42 | | X |
| Customer Service Rep | 37 | | X |
| Customer Service Rep | 67 | X | |
| Customer Service Rep | 45 | | X |
| Customer Service Rep | 38 | | X |
| Customer Service Rep | 52 | | X |
| Customer Service Rep | 64 | | X |
| Customer Service Rep | 56 | | X |
| Customer Service Rep | 63 | | X |
| Customer Service Rep | 62 | | X |

| Job Title | Age | Selected | Not Selected |
|---|---|---|---|
| Customer Service Rep | 36 | | X |
| Customer Service Rep | 56 | | X |
| Director of Sales | 52 | X | |
| Director of Sales | 50 | | X |
| Director of Sales | 64 | | X |
| Field Application Engineer | 69 | | X |
| Field Application Engineer | 56 | | X |

| | | | |
|---|---|---|---|
| Field Application Engineer | 48 | | X |
| Field Application Engineer | 57 | | X |
| Field Application Engineer | 48 | | X |
| Field Application Engineer | 49 | | X |
| Inside Sales Rep | 25 | | X |
| Inside Sales Rep | 57 | | X |
| Inside Sales Rep | 65 | | X |
| Inside Sales Rep | 59 | | X |
| Inside Sales Rep | 31 | | X |
| Inside Sales Rep | 50 | X | |
| Inside Sales Rep | 49 | | X |
| Marketing Manager | 48 | X | |
| Marketing Performance Manager | 61 | | X |
| Regional Sales Manager | 53 | | X |
| Regional Sales Manager | 45 | | X |
| Regional Sales Manager | 55 | | X |
| Sales Manager | 41 | | X |
| Territory Manager | 27 | | X |
| Territory Manager | 46 | | X |
| Territory Manager | 48 | X | |
| Territory Manager | 34 | | X |
| Territory Manager | 45 | | X |
| Job Title | Age | Selected | Not Selected |

| | | | |
|---|---|---|---|
| Territory Manager | 42 | | X |
| Territory Manager | 32 | | x |
| Territory Manager | 58 | X | |
| Territory Manager | 51 | | x |
| Territory Manager | 61 | | X |
| Territory Manager | 65 | | X |
| Territory Manager | 54 | | X |
| Territory Manager | 59 | | X |
| Territory Manager | 50 | | X |
| Territory Manager | 52 | | x |
| Territory Manager | 62 | X | |

63. Plaintiff was able to make successful strategic decisions. Plaintiff never received a negative performance review.

64. Plaintiff managed his team successfully. Plaintiff's first effort is always to coach an underperforming employee. Only after that fails would he terminate employees with weak performance. Over the course of Plaintiff's tenure he did coach and ultimately terminate, or manage the exit, of a number of salespeople and managers. On information and belief, it was eight employees. However, Plaintiff did fail to get the older employees to retire and leave as upper management, including Mr. French, encouraged him to do repeatedly.

**<u>PLAINTIFF'S UNLAWFUL TERMINATION</u>**

65. Mr. von Boxberg and Mr. Dilger, made ageist comments to Plaintiff as near as a week or two before his termination. The comments were directly related to retirement,

terminating older employees and "uptalenting" by hiring new younger professionals to replace the older employees.

66. On information and belief, in July 2015, an on at least two occasions thereafter, Mr. French discussed Plaintiff's termination with Mr. von Boxberg and Mr. Dilger. Mr. French was not part of Plaintiff's team and had no knowledge of his work performance, leadership skills, accomplishments, work ethic or any insight into what he was capable of doing. Mr. French asked for their input regarding the decision to terminate Plaintiff's employment. Mr. von Boxberg and Mr. Dilger both had conversations with Mr. French about Plaintiff's value to Osborn and stated that he was doing the job that was needed, and was in fact the right person for the job.

67. The fact that Mr. French, Mr. von Boxberg and Mr. Dilger discussed Plaintiff's potential termination and that Plaintiff was "close to being terminated in July 2015," is all new information to Plaintiff. Plaintiff was never told of his potential termination. Plaintiff did not discover that Mr. French had been discussing his termination with Mr. von Boxberg and Mr. Dilger until the EEOC proceeding. Plaintiff knew that Mr. von Boxberg and Mr. Dilger had encouraged him to retire and forced him to encourage other older employees to retire. Plaintiff knew that Mr. von Boxberg and Mr. Dilger were motivated to get older employees to retire so they could replace them with younger employees, but Plaintiff was honestly surprised to learn that they knew Osborn was planning to terminate him and that they influenced the decision by discussing it in depth with Mr. French. After receiving Osborn's response to his EEOC charge, Plaintiff reached out via email to Mr. von Boxberg and Mr. Dilger for confirmation.

Plaintiff's May 19, 2016 email, in pertinent part, to both Mr. von Boxberg and Mr. Dilger separately:

-----Original Message-----
From: Mark C. Johnson <mcj1954@aol.com>
To: florestan.boxberg <florestan.boxberg@t-online.de>
Sent: Thu, May 19, 2016 10:28 am
Subject: Looking for your input

Florestan,

Is it true that Brian French wanted me fired back in July? And that you and Dilger argued against that call? This is what they stated in their response....

Were there ongoing conversations from that point on where my performance was called into question? Was there pressure or even just ongoing conversations about eliminating me after July?

And when we put together the lists of targets for termination in December, where if I recall correctly we developed A, B and C lists, was I on one of those lists too?

I need to better understand what was going on those last six months....

Mr. Dilger's response:

-----Original Message-----
From: Dilger <Dilger@t-online.de>
To: Mark C. Johnson <mcj1954@aol.com>; florestan.boxberg <florestan.boxberg@t-online.de>
Sent: Thu, May 19, 2016 11:30 am
Subject: AW: My continuig saga

Hi Mark

thanks for the update - I am really sorry that this is turning into a rather ugly battle... I had hoped that you would have accomplished a fair compromose Agreement but with the new Kids on the block this seems to be impossible.

As to Mr. French´s recommendation at the time, unfortunately that´s true - he did suggest for you to be teminated more than once. I believe I had indicated to you a couple of times some headwind from MIL towrds you. And yes, it´s also true that FvB and I resisted this decision more than once - and we both would do this again every day.

Chris

On May 19, 2016, Mr. von Boxberg, did not reply via email but asked Plaintiff to call him to discuss.

In that conversation, Mr. von Boxberg stated in response to Plaintiff's emailed questions:

> 1. Yes back in July 2015, and he thought earlier than that, there was a suggestion made by Brian French that Plaintiff be removed. Florestan and Chris did not support that as, Plaintiff was not doing a bad job in their eyes; the decisions made around the Reps and subsequent reversal were not Plaintiff's decisions but were joint decisions; there was no one suitable to replace Plaintiff; and Osborn/Jason were in the midst of major reorg so timing was bad.
>
> 2. Discussions regarding Plaintiff's termination did not end there, it was brought up again even as Westgate (CEO) was leaving/left in November 2015. There was a loosely constructed plan that in two or three years Plaintiff could step back to another role and Andre (who is substantially younger than Plaintiff) could step up to Plaintiff's role after he learned the business.
>
> 3. In a November 2015 Executive Committee meeting senior leadership did put together an A, B and C prioritization list of who to fire. The C list was a long list, that included Plaintiff.

68. Also in this May 19, 2016 conversation with Mr. von Boxberg, he said, in regard to the A, B, and C lists that if that were to have come to pass, and he would not have needed both Plaintiff and Andre Pelletier, that he would have chosen to remove the older one (Plaintiff) instead of the younger employee, Andre.

69. According to Mr. von Boxberg, Brian French was not a fan of Plaintiff. When Plaintiff asked about whether he (Mr. von Boxberg) had a role in the decision to fire Plaintiff, he said that he did and that Brian was never one to make a decision -he floated ideas. Mr. von Boxberg said it was not Mr. French's role to make that call. As long as we were the business unit it was Mr. von Boxberg's decision, not Brian French's.

70. Mr. von Boxberg and Mr. Dilger were decision makers regarding whether Plaintiff was terminated.

71. The 2015 reorganization and headquarters move is why Mr. von Boxberg and Mr. Dilger could not fire Plaintiff in July 2015 or in the months there after. Mr. von Boxberg and Mr. Dilger were motivated to keep Plaintiff because it was a critical transition time in moving headquarters from Cleveland to Richmond and reorganizing, hiring and onboarding new salespeople, marketing and customer service representatives. They had no one else with the knowledge and skill set to execute the transitions. On information and belief, Mr. von Boxberg and Mr. Dilger kept Plaintiff around just long enough for Plaintiff to execute the transitions and then once the new teams and businesses had stabilized, they fired him.

72. Any and all age discrimination comments made by Mr. von Boxberg and Mr. Dilger were also made in the presence of Osborn management team, and with the support of Mr. Westgate and Mr. Cripe. Westgate, Cripe, von Boxberg, Dilger and Plaintiff have all "resigned" (forced out) or were terminated.

73. In every communication with Plaintiff regarding his termination he was told it was a "position elimination". Plaintiff asked directly if his termination was in any way performance based and he was told "no," it was simply a position elimination. When Plaintiff was being terminated the morning of the January 19, 2016, he asked Mr. Carollo and Mr. Cunningham directly, in separate conversations, whether he was being terminated for performance and was told "no" by both men. On January 20, 2016, Plaintiff asked Mr. Cunningham alone whether he was being terminated for performance, and he assured Plaintiff, "no." And then on Wednesday, January 21, 2016, Plaintiff asked Mr. French and Cunningham together, when he argued his case for a better exit package than what had been offered, whether he was being terminated for performance

and they assured Plaintiff "no" once again, that his termination was a position elimination. Any other reason they conjure up now is pretext.

74. Ongoing since July 2015, Mr. French had discussions with Plaintiff's bosses, Mr. von Boxberg and Mr. Dilger, about the decision to terminate Plaintiff's employment. Mr. French was not directly familiar with Plaintiff's work and did not interact with him on a regular basis. He had no foundation, on his own, to decide whether Plaintiff should be terminated. He was too far removed to make a capable judgement. That is why Mr. French had to reach out to Mr. von Boxberg and Mr. Dilger about Plaintiff's work performance. Mr. von Boxberg and Mr. Dilger assured Mr. French on multiple occasions that Plaintiff could perform his job duties and that he should not be terminated. These conversations about the decision to terminate Plaintiff happened in July 2015 and at least on two occasions after, but Mr. von Boxberg and Mr. Dilger convinced Mr. French to hold off on firing Plaintiff until the restructure and headquarters move was stabilized. However, Mr. French then, after realizing that Mr. von Boxberg and Mr. Dilger would not agree to Plaintiff's termination, chose to fire them as well on January 19, 2016. Plaintiff. Mr. von Boxberg and Mr. Dilger were all terminated on January 19, 2016.

75. On Tuesday January 19, 2016, Plaintiff was unlawfully terminated because of his age. Plaintiff never had a negative performance review and he was never given a verbal or written warning. On January 19, 2016, at about 8:15 am Steve Carollo, who Plaintiff knew somewhat as the President of the Jason Components Group (one of the four Jason Divisions), and Marc Cunningham, the HR Manager, walked into his office and closed the door. After some brief pleasantries Steve started talking vaguely about a major restructuring. Plaintiff's first thought was actually that he was going to be asked to take

on a new position with Steve's group. Why else would the President of another division come to Richmond, IN and be sitting in his office? As Steve continued he stated simply that Plaintiff's position was being eliminated and that Plaintiff was to be terminated. Plaintiff asked, "Effective when?" and was told "immediately." Plaintiff asked, "How immediate is immediate?" Plaintiff was told "right now." Plaintiff asked several times if this was performance based and was told in very clear terms only that his position was being eliminated. Plaintiff asked who else was involved and was told only that his boss, Chris Dilger (approximately age 60) and the President, Florestan von Boxberg (approximately age 55), both in Germany, were also told that morning of their immediate dismissal. Plaintiff asked again if there was any performance issue and was again told it was a position elimination.

76. Upon Plaintiff's termination, he was given a box to pack his belongings, asked to hand over his computer, laptop, phone and keys. Plaintiff said he needed the phone, handed over everything else and asked if he could say good bye to those of his managers and co-workers who were in the office. Plaintiff was allowed "a few minutes" to shake a few hands and was out the door with his box by 9:30. Plaintiff was given nothing in writing at that time.

77. When Plaintiff went to say goodbye to one of his managers, Jon Michael Raymond, Plaintiff learned of a January 19, 2016 email that was sent from Jeff Quinn, the Chairman/CEO outlining the collapse of the four divisions into two and the elimination of the two Presidents, Florestan von Boxberg and Dave Cataldi, President of Janesville Acoustics. There was no reference to any other terminations in that announcement so Plaintiff's manager assumed he was only being briefed. When Plaintiff told Jon Michael

he was being terminated his shock was as great as Plaintiff's. Plaintiff only had a chance to tell five people he was leaving (Jon Michael, Spencer Maheu, Brian Smith, Dennis Meehan, Thom MacLean) and each was as surprised as he was.

78. On January 21, 2016, Plaintiff received an email from Marc Cunningham with his proposed separation agreement. Included with the separation agreement was Exhibit A which Plaintiff understands is required by law. All persons selected for termination were provided with this waiver at the time they were informed of their termination unless the Employee had a pre-existing Employment Agreement or they are employed outside the United States, and these employees are designated by an asterisk next to their job title. The following is a listing of the ages and job titles of employees who: (1) were not selected for termination; and (2) were selected for termination and offered consideration for signing this waiver.

| Job Title | Age | Selected (X) | Not Selected (X) |
|---|---|---|---|
| Vice-President, N.A. Sales – JFG | 61 | X | |
| Vice-President, Sales and Marketing – JCG | 43 | | X |
| Vice-President, Sales and Marketing – Seating | 53 | | X |
| Vice-President, Commercial – Janesville Acoustics | 52 | | X |
| President, Sealeze | 61 | X | |
| General Manager and Vice-President of Assembled Products | 53 | X | |
| Vice-President, Sales – JFG | 60 | X | |

79. Not included on this list is Doug Mattice of Sealeze who, on information and belief, is about 68 years old. Doug was easing his way to retirement, had been asked to step down from his VP role three months prior to make room for a young manager from another division. He was not given nor had he offered a specific time he would step away completely. He was terminated by Steve Carrollo Wednesday, January 20, 2016 along with his boss, Doug Pollack, President of Sealeze.

80. Not included in this listing were the two Presidents, Florestan von Boxberg and Dave Cataldi. Mr. Dilger was also excluded from this list.

81. Of those listed in Exhibit A above, plus Doug Mattice, 4 of the 5 who were terminated are aged 60 or older and all 4 were from JFG, Plaintiff's division. Defendant has a practice of age discrimination and favoring younger employees over older employees.

82. Defendant has a management practice of terminating older employees because of their age. In this 2016 "restructure" the following employees were terminated or "resigned" (which in many cases, on information and belief, was code for "got forced out because of age, but were high enough up in the corporate hierarchy that they got to choose how their exit was communicated"): Mark Johnson, age 61 (replaced with Jeff Fleming, 43 years old) ; Florestan von Boxberg, age mid-50s; Chris Dilger, age 60; David Westgate, age mid-50s; John Bhatka, age 67; Dennis Meehan, age 52, Brian Smith, age approx. 50; Michael Fulcher, approx. 50; Michael Cassady, age 58; John Corbin, age 62; Art Varvoutis (he finally agreed to "retire") age mid 60s; Dave Bartléy, late 60s; Doug Mattice, age 68; and Doug Pollack, age 61.

83. Once Mr. von Boxberg and Mr. Dilger and Plaintiff were fired, Mr. Steve Carollo, was promoted to President of Jason Components on January 19, 2016. Mr. Carollo had a

close relationship with Mr. Jeff Fleming. Jeff Fleming took Plaintiff's job as Vice-President of Sales. Jeff Fleming is 18 years younger than Plaintiff. Mr. Fleming was new to Jason, had no experience in the industries or in the go to market strategies Osborn was involved in, and on information and belief had never managed as large a sales organization like Osborn. Plaintiff's position was not eliminated (the reason he was given upon termination). Rather, he was replaced by Mr. Fleming who is substantially younger and significantly less experienced than Plaintiff.

84. On information and belief, Plaintiff was terminated because of his age not because his job was "eliminated." Plaintiff was discriminated against and treated differently than similarly situated younger employees.

## V. COUNT ONE: AGE DISCRIMINATION PURSUANT TO AGE DISCRIMINATION IN EMPLOYMENT ACT (ADEA)

85. The allegations of paragraphs 1-85 are incorporated herein by reference as if fully pleaded herein in Count One.

86. Plaintiff, age 61 on the date of the adverse employment action and discrimination, was/is at all relevant times in question a highly qualified and respected employee of the Defendant, pursuant to the Age Discrimination in Employment Act (ADEA).

87. Plaintiff was subjected to a series of continuous adverse employment actions as described herein, including but not limited to unequal treatment on account of his age and unlawful termination all taken because of (but for) his age.

88. Defendant discussed with Plaintiff on several occasions when Plaintiff planned retire.

89. Defendant, on several occasions during the years 2011-2016, pressured Plaintiff to directly ask its older employees when they would retire.

90. Defendant, on several occasions during the years 2011-2016, made it known to Plaintiff that he was required to encourage older employees with "short runways" to retire.

91. Defendant stated that the reason for Plaintiff's termination was job elimination which is factually baseless and without merit because his job and job duties were absorbed, replaced and/or taken over by a substantially younger employee. This substantially younger employee was not forced out. Defendant's reason for the adverse actions are pretextual or false.

92. Plaintiff was denied equal treatment in the terms, conditions and privileges of his employment but for his age.

93. On information and belief, Defendant exhibited a continuous pattern and practice of age discrimination. The Defendant's discrimination against older employees was standard operating procedure at the company for the time of Plaintiff's employment. On information and belief, the Defendant would use unequal and factually baseless performance management techniques which targeted older employees, including Plaintiff, with the goal of forcing them to quit their employment or develop a for cause basis to terminate their employment, while substantially younger and similarly situated employees were not treated in the same manner.

94. Defendant should be held liable for discriminating against Plaintiff on account of his age, in violation of the ADEA.

## VI. COUNT TWO: AGE DISCRIMINATION PURSUANT TO INDIANA AGE DISCRIMINATION ACT (IADA)

95. The allegations of paragraphs 1-94 are incorporated herein by reference as if fully pleaded herein in Count Two.

96. Plaintiff, age 61 on the date of the adverse employment action and discrimination, was/is at all relevant times in question a highly qualified and respected employee of the Defendant, pursuant to the Indiana Age Discrimination Act (IADA), Ind. Code. §22-9-2-2.

97. Plaintiff was subjected to a series of continuous adverse employment actions as described herein, including but not limited to unequal treatment on account of his age and unlawful termination all taken because of (but for) his age.

98. Defendant discussed with Plaintiff on several occasions in 2014, 2015 and 2016 when Plaintiff planned retire.

99. Defendant, on several occasions during the years 2011-2016, pressured Plaintiff to directly ask its older employees when they would retire.

100. Defendant, on several occasions during the years 2011-2016, made it known to Plaintiff that he was required to encourage older employees with "short runways" to retire.

101. Defendant stated that the reason for Plaintiff's termination was job elimination which is factually baseless and without merit because his job and job duties were absorbed, replaced and/or taken over by a substantially younger employee. This substantially younger employee was not forced out. Defendant's reason for the adverse actions are pretextual or false.

102. Plaintiff was denied equal treatment in the terms, conditions and privileges of his employment but for his age.

103. On information and belief, Defendant exhibited a continuous pattern and practice of age discrimination. The Defendant's discrimination against older employees was standard operating procedure at the company for the time of Plaintiff's employment. On

information and belief, the Defendant would use unequal and factually baseless performance management techniques which targeted older employees, including Plaintiff, with the goal of forcing them to quit their employment or develop a for cause basis to terminate their employment, while substantially younger and similarly situated employees were not treated in the same manner.

104. Defendant should be held liable for discriminating against Plaintiff on account of his age, in violation of the IADA.

## VII. PRAY FOR RELIEF

**WHEREFORE**, Plaintiff requests the following relief:

A. Declare that the Defendant intentionally and willfully discriminated against
   i. Plaintiff on account of his age pursuant to the ADEA;
   ii. Plaintiff on account of his age pursuant to the IADA, Ind.Code. §22-9-2-2;

B. Award of compensatory to Plaintiff;

C. Award of punitive and liquidated damages to Plaintiff;

D. Award attorney's fees and costs;

E. Award of interest and costs;

F. Award such other relief in law or equity as this Court deems appropriate.

## VIII. JURY TRIAL DEMANDED

Plaintiff respectfully requests a jury trial on all questions of fact raised by his Complaint.

PLAINTIFF,
MARK C. JOHNSON

By: Mark P. Carey (IN pending)
Mark P. Carey, P.C.
71 Old Post Road, Suite One
Southport, CT 06490
(203) 255-4150 tel.
(203) 255-0380 fax.
Mcarey@capclaw.com
His Attorney

**CERTIFICATE OF SERVICE**

I certify that on July 20, 2016 a copy of the foregoing Complaint was mailed, by overnight delivery, postage prepaid and properly addressed to the following:

Clerk of Court
United States District Court
46 East Ohio Street
Indianapolis, IN 46204

Timothy G. Costello
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
Pabst Boiler House
1243 North 10th Street, Suite 210
Milwaukee, WI 53205
(via email and mail)

Mark P. Carey
Mark P. Carey, P.C.
71 Old Post Road, Suite One
Southport, CT 06890
(203) 255-4150 tel.
(203) 255-0380 fax.
Mcarey@capclaw.com